(211 P.3d 829)

No. 101,528

IN THE INTEREST OF L.C.W.

Opinion filed July 10, 2009.

*Richard E. James*, county attorney, and *Donna J. Long*, guardian ad litem, for appellant State of Kansas.

*Robert G. Shivley*, of Manhattan, and *Brenda M. Jordan*, of Manhattan, for appellees natural parents.

Before GREENE, P.J., PIERRON and GREEN, JJ.

GREENE, J.: The State appeals the district court's reversal of the district magistrate judge's finding that L.C.W. was a child in need of care under K.S.A. 2008 Supp. 38-2202(d)(2), arguing the district court erred in applying an erroneous standard of review and in ignoring or discounting evidence that adequately supported the magistrate judge's finding. We disagree and affirm the district court.

### *Factual and Procedural Background*

The State was prompted to file its child in need of care petition by the paternal grandmother's concern that L.C.W.'s natural parents were not providing a safe environment for their 4-month-old son. A temporary custody hearing was held on April 30, 3008, and the district magistrate judge placed L.C.W. in the custody of the Secretary of the Kansas Department of Social and Rehabilitation Services (SRS), which placed the child with L.C.W.'s paternal grandmother. An admit/deny hearing was held on May 21, 2008, and adjudication was set for July 9, 2008.

The adjudication hearing was initially continued when the mother and guardian ad litem did not appear. On August 6, 2008, the hearing was again continued until the parents provided a copy of their motion to dismiss indicating proper notice was given. Finally, the case was continued from September 10 to September 25. The district magistrate judge found that all continuances were for good cause.

At the adjudication hearing on September 25, 2008, the district magistrate judge found that L.C.W. was a child in need of care. Mother and father appealed the magistrate's decision to the district

court. After reviewing the record, the district court reversed the finding that L.C.W. was a child in need of care, finding the State failed to prove by clear and convincing evidence that L.C.W. was a child in need of care. The State timely appeals.

## Is This Appeal Subject to Dismissal Due to Failure to Comply with Statutory Time Constraints?

Appellees raise a threshold issue challenging our jurisdiction to proceed due to the failure of the State to comply with the statutory requirement that the order of adjudication was not entered within 60 days from the date L.C.W. was removed from his parents' custody. Although no cross-appeal was perfected, we have a duty to consider our jurisdiction on our own motion at any time. When the record discloses a lack of jurisdiction, it is the duty of an appellate court to dismiss the appeal. *State v. Denney*, 283 Kan. 781, 787, 156 P.3d 1275 (2007).

The statutory requirement is found at K.S.A. 2008 Supp. 38-2251(c):

"A finding that a child subject to this code is a child in need of care shall be entered without undue delay. If the child has been removed from the child's home, an order of adjudication shall be entered as soon as practicable *but not more than 60 days from the date of removal* unless an order of informal supervision has been entered or an order of continuance for good cause has been entered." (Emphasis added.)

Here, L.C.W. was removed from parental custody on April 30, 2008, and the order of adjudication was entered September 25, 2008, nearly 150 days later. Although the record reflects that continuances were granted for good cause, we note that even the first or original setting for adjudication was beyond the 60 days.

The resolution of this issue involves a determination of whether the procedural language of K.S.A. 2008 Supp. 38-2251(c) that imposes the 60-day time constraint is mandatory or directory. Interpretation of a statute is a question of law over which an appellate court has unlimited review. *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1031, 181 P.3d 549 (2008).

" 'Whether language in a statute is mandatory or directory is determined on a case-by-case basis and the criterion is whether

compliance with [the language] is essential to preserve the rights of the parties.' [Citations omitted.]" *Marais des Cygnes Valley Teachers' Ass'n v. U.S.D. No. 456*, 264 Kan. 247, 251, 954 P.2d 1096 (1998). If it is essential to the preservation of the rights of the parties, the statute is mandatory. Factors indicating the provisions of a statute are mandatory are: (1) The use of negative words that require an act shall be done by no other method or at no other time than that stated, or (2) a provision for a penalty or other consequence for noncompliance. 264 Kan. at 251. The statute is directory where the provision establishes a manner of proceeding and a time within which an official act is to be done and is intended to secure order, system, and dispatch of the public business. 264 Kan. at 251.

Applying those factors, we note that K.S.A. 2008 Supp. 38-2251(c) provides that an order of adjudication shall be entered not more than 60 days from the date of removal, but it does not include any provision for a penalty or other consequence of noncompliance. The statute is clear, however, in providing that an order of adjudication shall be entered "not more than 60 days from date of removal unless . . . ." We also note that the period prior to adjudication in this case was substantially beyond the 60-day time constraint.

A panel of our court addressed similar time constraints within the prior Kansas Code for the Care of Children (repealed and Revised Code enacted effective January 1, 2007; see L. 2006, ch. 200) in *In re B.H.*, 32 Kan. App. 2d 12, 16-18, 80 P.3d 396 (2003), and concluded these constraints were directory only. The statutory time constraints addressed by the panel were K.S.A. 38-1561 and K.S.A. 38-1581(c), which provided respectively:

"The order of disposition may be entered at the time of the adjudication, but shall be entered within 30 days following adjudication, unless delayed for good cause shown." K.S.A. 38-1561.

"The county or district attorney or the county or district attorney's designee shall file pleadings alleging a parent is unfit and requesting termination of parental rights or the establishment of a permanent guardianship within 30 days after the court has determined reintegration is not a viable alternative unless the court has found a compelling reason why adoption or permanent guardianship may not be

in the best interest of the child. The court shall set a hearing on such pleadings and matters within 90 days of the filing of such pleadings." K.S.A. 38-1581(c).

In concluding the statutory time constraints were directory rather than mandatory, the court reasoned:

"Although time limitations for a child in need of care case are stated in the statutes, they must be read in concert with K.S.A. 38-1501, which instructs that the Kansas Code for Care of Children shall be liberally construed. The time frames prescribed by the statutes are to see that a severance case is expeditiously resolved and to protect parties from unreasonable delay. But, a rigid interpretation of the statutes would do little to further the end that each child shall receive the care, custody, guidance, control, and discipline, preferably in the child's own home, as will best serve the child's welfare and the best interests of the State." 32 Kan. App. 2d at 18.

See K.S.A. 2008 Supp. 38-2201(b)(1), (2) (same purposes; liberally construed; best interests, safety, and welfare of child are paramount; care and control shall best serve the child's welfare, recognizing the child's family relationship is important to the child's well-being).

We conclude that the reasoning of *In re B.H.* is sound, and we follow it here in holding that the 60-day constraint of K.S.A. 2008 Supp. 38-2251(c) is directory rather than mandatory. Although it is an important deadline, we view the time constraint as establishing a manner of proceeding for purposes of order, system, and dispatch of the public business. See *In re B.H.*, 32 Kan. App. 2d at 17 (quoting *Marais des Cygnes Valley Teachers' Ass'n*, 264 Kan. at 251).

Despite the directory nature of the statutory time constraint, we note that the panel deciding *In re B.H.* also considered whether prejudice had been shown to result from the delay. See 32 Kan. App. 2d at 18. We agree this is an appropriate consideration, but here there was no showing of prejudice. In fact, some of the delay was caused by failure of mother or the guardian ad litem to appear for adjudication hearings. Absent an appropriate showing of prejudice, we conclude there was no time defect in these proceedings, and our jurisdiction to proceed with this appeal is sound.

Having held that the 60-day time constraint within K.S.A. 2008 Supp. 38-2251(c) is merely directory, we emphasize that the con-

straint is important, and the better practice dictates compliance with it. Although we have excused substantial noncompliance here due in part to the absence of a showing of prejudice, we may not be so inclined in future appeals where the order is entered substantially beyond the statutory constraint and prejudice is shown.

### Did the District Court Err in Its Review of the Magistrate Judge's Decision?

The State's principal argument on appeal is that the district court did not apply the correct standard of review in its review of the magistrate judge's decision because there was no indication that the district court reviewed the evidence in the light most favorable to the State.

The district court reviews an order of a magistrate judge in these cases under K.S.A. 2008 Supp. 38-2273(b) and does so on the basis of the record, unless no record was made. Whether its review is on the record or based on a new trial, the district court is to make a de novo determination, and the procedure is governed by K.S.A. 20-302b(c) and K.S.A. 2008 Supp. 60-2103a. See K.S.A. 2008 Supp. 38-2273(c). When called upon to review the decision of a district court that has sat in review of the magistrate judge, we apply our appellate standard of review to the district court's decision. That standard was set forth in In re B.D.-Y., 286 Kan. 686, 705, 187 P.3d 594 (2008):

"When an appellate court reviews a trial court's determination that a child is a child in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, i.e., by clear and convincing evidence, that the child was a CINC [child in need of care]."

K.S.A. 2008 Supp. 38-2202(d)(1) defines a child in need of care as one who is "without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian."

Here, we concede the case was more difficult than some. At the outset of our review, we note that the State generally alleged L.C.W. was a child in need of care because L.C.W. was (1) without adequate parental care, control, or subsistence and the condition

was not due solely to the lack of financial means of the child's parents or other custodian and (2) without the care or control necessary for the child's physical, mental, or emotional health per K.S.A. 2008 Supp. 38-2202(d)(2). The specific allegations in the petition were that (1) L.C.W. was always dirty; (2) L.C.W. was often unattended when the parents were asleep during the daytime hours while the child was awake; (3) the parents were not keeping appointments with Dr. Elizabeth Koerner for Kan-B-Healthy exams; (4) the paternal grandparents found methamphetamine in the parents' car and believed that the parents were using; (5) there was concern that the parents were using methamphetamine while the baby was in their care and control; (6) both mother and father were arrested in Washington County; and (7) neither parent was working, and both had lost their jobs in recent months.

At the evidentiary hearing held by the magistrate judge, father testified that it was customary to leave L.C.W. with L.C.W.'s grandmother on the weekends. Grandmother bought milk for L.C.W. while L.C.W. was in L.C.W.'s parents' care because mother had missed appointments required for support from the Women, Infants, and Children Program (WIC), thus losing those benefits. Grandmother testified that she would stop by the house and it was pitch black in the middle of the day because mother and father were "always sleeping." On one occasion, she went during the day and L.C.W. was awake in the swing and the house was black. Finally, there was testimony that L.C.W. was not current on vaccinations or Kan-B-Healthy checkups and that upon one missed appointment the doctor's office was unable to contact mother.

Grandmother described mother and father as good parents when L.C.W. was born but noted a change in their behavior around the time they both lost their jobs. She testified that the two became angry and violent when using methamphetamine and that there had been a confrontation between her and L.C.W.'s parents wherein she threatened to take L.C.W. if mother and father did not stop using drugs. Father's brother testified that he found a bag of white substance in father's wallet and upon police testing it tested positive for methamphetamine.

On April 27, 2008, mother and father were arrested and charged with trespassing, burglary, and theft, an arrest which resulted in them being unable to pick up L.C.W. from grandmother's care. Father was also charged with possession of methamphetamine, but this count and other felony counts were dismissed. Mother testified the matter had been disposed of and that she was given probation. Because of the arrest and detention, both parents were not able to pick up L.C.W. from grandmother on Sunday night of that weekend. Grandmother went to an attorney's office to determine what had to be done to prevent L.C.W. from going into foster care. Mother contacted grandmother on Monday night after she was bonded out of jail. Grandmother initially would not tell her where L.C.W. was, but when mother called for officer assistance, L.C.W. was returned to mother a few hours later.

In contrast, both parents denied using methamphetamine in the weeks leading up to April 30, 2008, and stated they never used methamphetamine while L.C.W. was in their care. When mother told her doctor she was afraid that L.C.W. would be taken away, the doctor told her there was no danger of the child being taken unless "something illegal was going on." The doctor offered to do a drug test, but mother said she was unable to complete the test. The testimony from L.C.W.'s doctor, however, was compelling in support of a finding that the child was not in need of care. The doctor testified that she did not have concern regarding L.C.W.'s physical or mental well-being or safety. She had no concern over mother's ability to adequately parent and wrote a letter on her behalf, which stated that L.C.W. had "been brought to four well child/Kan-B-Healthy visits since [being] born, all while in the custody of . . . mother. At these appointments [L.C.W.] was clean, well-nourished, growing appropriately, and no developmental delays were noted." The doctor testified that she was not concerned about L.C.W. missing one visit. Mother then testified that she would try to take naps at the advice of her doctor when L.C.W. was sleeping. She also testified that L.C.W. was not always dirty, as alleged, and that she had received instruction from her physician about how often to bathe L.C.W.

Although the guardian ad litem conceded the case was difficult and noted that "there's been a lot of positive things that we've heard today." Nevertheless, she ultimately recommended an adjudication of L.C.W. being a child in need of care based on the totality of the evidence, especially the parents' recent arrest in Washington County, stating:

"I believe at that time that that child was a child in need of care, because [L.C.W.] was not under the care of [the] parents, because they were in jail. And it wasn't until [mother] bonded out Monday afternoon that she was able to come and get the child. And it was just because of [grandmother] agreeing to keep the child and provide for day care for [L.C.W.], that the child was not put in foster care. For that reason, as well as the things that seemed to be going astray leading up to that event, I recommend that you find the child to be a child in need of care."

The district court reversed the magistrate judge based in its review of the record, stating in material part:

"The most compelling testimony presented was that of Dr. Elizabeth Koerner, the child's doctor. Dr. Koerner stated she had no concern regarding the child's physical or mental well-being, and no concern for [L.C.W.'s] safety. The State in closing states 'This case is about drug use.' This Court respectfully disagrees. The State has lost focus. This case is about a child named [L.C.W.], and about whether or not the child is likely to sustain harm if not removed from the home, or allowing the child to remain in the home is contrary to the welfare of the child.

"Just because parents use drugs, or have been convicted of using drugs, or drink too much alcohol, does not automatically mean the child is likely to sustain harm, or the home is contrary to the child's welfare. If that were the test, then thousands of children would be removed from the home weekly.

"What the State failed to prove was some connection between the parents' alleged (not proven) drug use and the child's welfare. The only evidence was that the child is healthy, was not left alone, and was not abused physically, mentally, or emotionally."

The State argues that the proceedings before the district court were not "a de novo appeal. As a result, the district court should have viewed the record in the light most favorable to the State, per *In re B.D.-Y.*" We disagree. Our court has been down this road before, although the pathway may not be well known to history.

A panel of this court took the position now advanced by the State in *In re J.H.*, 25 Kan. App. 2d 372, 962 P.2d 1127 (1998) (ordered withdrawn from publication March 5, 1999). Construing a prior

but nearly identical statute, K.S.A. 1998 Supp. 38-1591(b), the panel concluded that "[t]he implication of the statute is that if the prior proceedings were on the record, the district court's review would be something other than de novo." On petition for review, our Supreme Court disagreed and ordered the panel's published opinion withdrawn from publication, stating:

"The district judge's understanding corresponds to K.S.A. 1998 Supp. 20-302b(c). The correct standard for review in the district court is de novo on the record and, on appeal, the district court's decision is reviewed and not that of the magistrate. We, therefore, dismiss this appeal as moot and direct that the Court of Appeals opinion be withdrawn from publication." *In re J.H.*, No. 80,324, unpublished opinion filed March 5, 1999, slip op. at 5.

See K.S.A. 20-302b(c); K.S.A. 60-2103a(a).

Following this unpublished opinion from our Supreme Court and the controlling statutes, we must reject the State's argument and focus on the district court's decision as a de novo determination. The burden of proof in child in need of care cases is on the State, which must prove by clear and convincing evidence that the child is in need of care. K.S.A. 2008 Supp. 38-2250; *In re B.D.-Y.*, 286 Kan. at 690. Where the district court has concluded that the State has failed to meet its burden in a child in need of care proceeding, this is a negative finding that may not be reversed unless there was an arbitrary disregard of undisputed evidence or the district court's ruling was a result of bias, passion, or prejudice. *McCracken v. Kohl*, 286 Kan. 1114, 1121, 191 P.3d 313 (2008).

Here, we do not conclude there has been an arbitrary disregard of undisputed evidence, nor do we conclude the ruling was the result of bias, passion, or prejudice. Moreover, given that this was a very close case, we are convinced that a rational factfinder could have found by clear and convincing evidence that L.C.W. was not a child in need of care. As suggested by the district court, the evidence established that the parents did not leave the child alone (principally due to arrangements with grandmother), L.C.W.'s physician clearly had no concern over mother's fitness as a parent, and the physician testified that L.C.W. was always "clean, well-nourished, growing appropriately, and no developmental delays were noted." L.C.W.'s parents may not be model parents, but we agree

with the district court in focusing on the well-being of the child. We are convinced that a rational factfinder could have found by clear and convincing evidence that L.C.W. was not a child in need of care, and we do not perceive that the court erred in concluding the State failed to meet its burden.

Affirmed.